**Statement of Facts**

1. KPMG LLP ("KPMG") is a Delaware limited liability partnership and is one of the "Big Four" public accounting firms.

2. From 1996 until 2002, KPMG, through its tax partners, assisted high net worth United States citizens to evade United States individual income taxes on billions of dollars in capital gain and ordinary income by developing, promoting and implementing unregistered and fraudulent tax shelters. A number of KPMG tax partners engaged in conduct that was unlawful and fraudulent, including: (i) preparing false and fraudulent tax returns for shelter clients; (ii) drafting false and fraudulent proposed factual recitations and representations as part of the documentation underlying the shelters; (iii) issuing opinions that contained those false and fraudulent statements and that purported to rely upon those representations, although the KPMG tax partners and the high net worth individual clients knew they were not true; (iv) actively taking steps to conceal from the IRS these shelters and the true facts regarding them; and (v) impeding the IRS by knowingly failing to locate and produce all documents called for by IRS summonses and misrepresenting to the IRS the nature and extent of KPMG's role with respect to certain tax shelters.

3. This course of conduct was deliberately approved and perpetrated at the highest levels of KPMG's tax management, and involved dozens of KPMG partners and other personnel. Certain individuals involved were later promoted to firm-wide leadership positions. Moreover, during the period 1996 through 2002, KPMG changed its policies and practices in a manner that encouraged the sale of tax "products" to multiple clients. In this regard, KPMG changed its compensation structure in a manner that encouraged the sale of tax products, set policies and goals that demanded the creation and sale of tax products, and created within its tax department groups of partners and other personnel who were specifically charged with developing and selling tax shelters.

4. Throughout the period in question, the firm's internal control systems failed to prevent the improper and illegal conduct because of inherent weaknesses in the system of internal controls and because those controls that were in place were overridden by certain individuals in tax management. KPMG has implemented changes and enhancements to its internal control systems and will implement additional enhancements pursuant to the Deferred Prosecution Agreement with the Government, to ensure that such failures cannot recur. Further, KPMG has taken a number of personnel actions intended to ensure that all of the partners and employees responsible for the illegal conduct described herein have been separated from the firm. KPMG intends not only to ensure that none of its partners will in the future participate with its clients and others in fraud, but indeed, KPMG wants in the future to ensure that the highest standards of ethics and compliance with United States tax laws will be met by the firm, its leadership, partners,

personnel and clients.

***The Fraudulent Tax Shelter Activities***

5. KPMG tax partners helped design or sell the following tax shelters (and variations of them) to high net worth United States citizens during the period in question: Foreign Leveraged Investment Program ("FLIP"); Offshore Portfolio Investment Strategy ("OPIS"); Bond Linked Issue Premium Structure ("BLIPS"); and Short Option Strategy ("SOS").

6. FLIP was marketed and sold by KPMG between 1996 and 1999 to at least 80 high net worth individual clients and generated at least $1.9 billion in bogus tax losses; KPMG's gross fees from FLIP transactions were at least $17 million. OPIS was marketed and sold by KPMG between 1998 and 2000 to at least 170 high net worth individual clients, and generated at least $2.3 billion in bogus tax losses; KPMG's gross fees from OPIS transactions were at least $28 million. BLIPS was marketed and sold by KPMG between 1999 and 2000 to at least 186 high net worth individual clients, and generated at least $5.1 billion in bogus tax losses; KPMG's gross fees from BLIPS transactions were at least $53 million. SOS was marketed and sold by KPMG tax partners between 1998 and 2002 to at least 165 high net worth individual clients, and generated at least $1.9 billion in bogus tax losses; KPMG's estimated gross fees from SOS transactions were at least $17 million. In addition, at least 14 KPMG partners engaged in SOS transactions for their own account.

7. KPMG tax partners typically marketed the shelters to financially sophisticated, high net worth individuals who had at least $20 million in taxable gain, and who therefore would be interested in a shelter that would generate bogus losses that could be used to offset that gain, usually in the same tax year. For each of these tax shelters, the high net worth individual client selected the amount of the loss he or she wanted to generate, and the KPMG tax partners and the other promoters would then calibrate the size of all aspects of the transaction to generate that loss. KPMG and the other promoters and participants charged the high net worth individual clients a percentage of the selected tax loss, usually between 5 and 7%, to implement the transaction, an amount that included the fees of the promoters and other participants, as well as a small portion that would be used to execute the purported "investment" transactions. KPMG's share was usually 1 to 1.25% of the tax loss. KPMG's practice of charging a percentage of the purported tax losses mirrored the practice of competing tax shelter promoters, including other major accounting and law firms that developed and sold similar shelters.

8. FLIP and OPIS were designed by KPMG tax partners, a New York lawyer who at the time was a partner in a prominent national law firm (the "New York Lawyer"), other individuals, and two KPMG tax professionals who left KPMG in 1997 to form a purported "investment advisory" firm located

in San Francisco, which in truth and in fact was in the business of promoting tax shelters (the "purported investment advisory firm"). FLIP, OPIS, and variations sold by another major accounting firm were substantially similar. These shelters were intended to generate substantial capital losses through the use of a pre-arranged series of purchases of and options on stock of one of two prominent international banks followed by redemptions of those investments by the bank.

9. The FLIP and OPIS opinions signed by KPMG tax partners, and the representations drafted by KPMG tax partners and knowingly adopted by the high net worth individual clients, falsely stated that: (a) the client requested KPMG's opinion "regarding the U.S. federal income tax consequences of certain investment portfolio transactions," when in truth and in fact these were tax shelter transactions designed to generate bogus tax losses; (b) the "investment strategy" was based on the expectation that a leveraged position in the foreign bank securities would provide the "investor" with the opportunity for capital appreciation, when in truth and in fact the strategy was based on the expected bogus tax benefits to be generated; and (c) certain money was paid as part of an investment (i.e., for a warrant or a swap), when in truth and in fact the money constituted fees due to promoters and other facilitators of the transaction. All of these opinion letters were substantially identical, save for the names of the clients and entities involved, the dates, and the dollar amounts involved in the transactions.

10. Senior KPMG tax professionals criticized the viability of these transactions and specifically questioned whether the transaction had economic substance or risk and whether the non-resident alien, whose participation as an equity holder of the foreign corporation was critical to the expected tax treatment of the redemption, would be respected by the IRS as a true equity holder or would instead be treated as a service provider or debt holder being paid a fee to accommodate the "investor."

11. KPMG tax partners were instructed not to permit potential OPIS "investors" to retain a copy of KPMG's PowerPoint presentation describing the transaction because to do so would "DESTROY any chance the client may have to avoid the step transaction doctrine." In some cases KPMG tax partners took steps described below in paragraph 25 to assist high net worth individual clients to report the transactions in a fraudulent manner with the intent to evade federal income taxes.

12. BLIPS was designed by KPMG tax partners, the purported investment advisory firm, the New York Lawyer, and others. The BLIPS transaction was intended to generate a substantial ordinary or capital loss through the use of a loan issued at an above-market interest rate and with a substantial "loan premium" which was not in fact a true loan. KPMG tax partners and the purported investment advisory firm enlisted three prominent international banks — including one bank that also participated in FLIP,

OPIS, and SOS — to provide the purported "loans" used by the high net worth individual clients who participated in this shelter.

13. The BLIPS tax opinions signed by the KPMG tax partners purported to rely upon certain factual representations made by the high net worth individual clients. These representations, which were devised by KPMG tax partners and others involved in designing BLIPS and were knowingly adopted by the high net worth individual clients, were false and misleading. The New York Lawyer issued substantially identical opinions reaching the same conclusion and purporting to rely upon the same false representations.

14. Among the false representations in the BLIPS opinion letter was the representation that the high net worth individual client as well as the purported investment advisory firm "believed there was a reasonable opportunity to earn a reasonable pre-tax profit from the [BLIPS] transactions," when there was no such opportunity. As the KPMG tax partners and the high net worth individual clients well knew, there was no "reasonable likelihood of earning a reasonable pre-tax profit" from BLIPS, and instead the "investment" component of BLIPS was negligible, unrelated to the large "loans" that were the key elements of the purported tax benefits of BLIPS, and was simply window dressing for the BLIPS tax shelter.

15. The opinion letters and other documents implementing BLIPS also contained the false and fraudulent representation (among others) that the BLIPS "investment" was "highly leveraged." In truth and in fact, and as the KPMG tax partners and the high net worth individual clients well knew, there was no "leverage" in the BLIPS transaction — the negligible "investment" component was carried out and secured using only cash contributed by the high net worth individual client.

16. Another false representation contained in the opinion letters was that the duration of the individual's participation in the three-phase, seven-year investment program was dependent upon the performance of the program relative to alternative investments. The KPMG tax partners and the high net worth individual clients well knew throughout the development and implementation of BLIPS, and at the time the high net worth individual clients made this representation and the KPMG opinions were issued, that this representation was false and fraudulent. The principal purpose of the BLIPS transaction was to generate a tax loss to offset substantial income or gains, and in order to generate this purported tax benefit, the individuals had to and would withdraw from the BLIPS program by year end. Therefore, the KPMG tax partners and the high net worth individual clients knew and expected that the transactions would terminate by year end and indeed in approximately 60 days, the earliest time at which the high net worth individual client could trigger the promised tax loss, not at some investment-related point in any purported "seven-year" program. Throughout 1999, and as expected by the BLIPS participants, each of the high net worth individual clients who engaged in a BLIPS transaction

exited the transaction before year end (i.e., upon completion of the first 60 day "phase"). None of those individuals remained for three phases or seven years, and none earned a direct profit on their investment.

17. The "investment program" created by the purported investment advisory firm for the BLIPS transactions was described as a program of investments in foreign currencies intended to take advantage of volatility in foreign currencies through investments in foreign currency contracts, options and foreign currency denominated debt securities. However, when the high net worth individual clients who engaged in BLIPS transactions exited the transaction, the purported investment advisory firm typically acquired publicly traded equity securities to distribute to those clients, and to which the bogus tax basis generated through BLIPS would be "attached." In at least one case, a KPMG tax partner worked with the purported investment advisory firm and a high net worth individual client to identify publicly traded stocks that had already suffered large losses during the calendar year and used those stocks for "attaching" the bogus tax basis, for the purpose of creating the impression that the tax losses arose from the poor performance of the stocks and not from the BLIPS tax shelter.

18. Notwithstanding serious and valid concerns expressed by certain KPMG tax partners and other professionals throughout the development of BLIPS about the honesty of the proposed opinion letter and the credibility of the proposed factual representations (as well as other defects in the tax analysis contained in the opinions), Washington National Tax ("WNT"), the Department of Professional Practice - Tax ("DPP-Tax"), and other members of tax leadership approved BLIPS.

19. In March 2000, KPMG's tax leadership was advised by two of KPMG's top technical tax experts that BLIPS was "frivolous" and would "lose" in court, and was advised by professional and legal compliance personnel of the risks associated with tax shelter transactions like BLIPS, including the risk of criminal investigation, civil liability and penalties, action by the IRS's Director of Practice, and action by State Boards of Accountancy. Nevertheless, and despite the obvious facts about BLIPS and the warnings conveyed during that time frame, KPMG's tax leadership decided to authorize the issuance of favorable opinions on all of the 1999 transactions, and proceeded with the implementation of another series of BLIPS transactions in 2000.

20. SOS and variations on that shelter were designed to generate a substantial ordinary or capital loss through the creation of an artificially high basis in an interest in a partnership or other entity through a series of purchases and sales of offsetting options on foreign currency. KPMG's top technical experts concluded that the losses claimed from SOS transactions were *not* more likely than not to be upheld in court if challenged by the IRS. Nonetheless, KPMG's tax leadership permitted its tax professionals to market and implement the transactions, all of which were substantially

similar, and to prepare tax returns incorporating these bogus tax losses.

21. One KPMG tax partner from the Stratecon group (the "Stratecon Partner") even issued KPMG tax opinions stating that the bogus tax losses generated by the SOS tax shelter transactions were more likely than not to withstand challenge by the IRS, notwithstanding the conclusion of KPMG's top technical experts to the contrary. These opinion letters, and other associated documents, were false and fraudulent in many ways, including the following: they misrepresented SOS as an investment, when in truth and in fact, as the Stratecon Partner and the high net worth individual clients well knew, it was a tax shelter designed to generate tax losses; they falsely claimed that the "investor" would have entered into the option positions independent of the other steps that made up SOS, when in truth and in fact, as the Stratecon Partner and the high net worth individual clients well knew, the "investors" would not; and they falsely claimed that the option positions were contributed to a partnership to "diversify" the client's "investment" when in truth and in fact, as the Stratecon Partner and the high net worth individual clients well knew, the contribution was simply a necessary step in the tax shelter and was executed for the purpose of generating the tax loss. Although the Stratecon Partner took several steps to conceal his activity from both the IRS and some members of KPMG leadership, several senior tax partners knew of this activity. Ultimately, KPMG's Office of General Counsel determined that the Stratecon Partner had violated firm policies and recommended that the firm terminate him, but that recommendation was rejected in late 2002 by the former Deputy Chairman and tax leadership.

22. In addition to the SOS transactions implemented by the Stratecon Partner, a number of other KPMG tax partners assisted high net worth individual clients with SOS transactions for a fee generally equal to 1% of the tax losses to be generated. In these transactions, KPMG did not issue an opinion as to the legitimacy of claiming the losses purportedly generated by the shelter but those transactions were supported by opinions issued by other firms. When a senior KPMG tax partner at WNT reviewed a draft SOS opinion letter to be issued by the New York Lawyer to several high net worth individual clients of KPMG, the tax partner suggested that the representations upon which the draft opinion letter was based were not credible and questioned whether the high net worth individual client would be able to swear under oath in a court of law that the representations were true. Nonetheless, another KPMG tax partner continued to assist in the implementation of this SOS transaction and prepared and signed the tax returns of these clients incorporating the bogus tax losses, as did other KPMG tax partners in other SOS transactions.

***Steps Taken to Avoid IRS Scrutiny of the Tax Shelters***

23. KPMG tax partners actively took steps to conceal these shelters from the IRS. These actions included: (i) deciding not to register the tax shelters

with the IRS, as required by law; (ii) preparing tax returns for some high net worth individual clients that fraudulently attempted to make it less likely that the individuals would be audited or, if audited, less likely that the IRS would learn through the audit of the clients' participation in the tax shelter; and (iii) improperly seeking to conceal the transactions under the veil of sham attorney-client privilege claims.

24. As part of their efforts to conceal the tax shelters from the IRS, KPMG tax leaders decided not to register those tax shelters as KPMG was required by law to do. Specifically, the decisions not to register the tax shelters were made in the face of advice from its professional and legal compliance personnel that the shelters should have been registered. On at least one occasion, those professional and legal compliance personnel warned that a willful failure to register the shelters could be criminal conduct.

25. KPMG tax professionals prepared tax returns for some high net worth individual clients that fraudulently attempted to conceal the shelters from IRS scrutiny. Specifically, some KPMG tax partners worked with high net worth individual clients to use a grantor trust and net the short-term capital losses generated by these tax shelters with the long-term capital gains that the shelters were designed to offset. By this improper and fraudulent conduct, the high net worth individual clients reported on their tax returns only a small net gain or loss created by subtracting the large bogus shelter loss from the large long-term capital gain rather than reporting both large figures on their individual income tax returns. The purpose of making use of this "grantor-trust netting" was to conceal the bogus tax shelter losses from the IRS and thus reduce the risk of an audit of the high net worth individual clients, thereby reducing as well the risk that the IRS would scrutinize the shelters. Despite stark warnings by the partner-in-charge of the personal financial planning group within WNT that to engage in "grantor trust netting" might be criminal, a leader of the PFP group decided that each individual KPMG tax partner should decide for himself or herself whether he or she felt comfortable advising high net worth individual clients to engage in "grantor trust netting" or to participate in this practice.

26. The Stratecon Partner took additional fraudulent steps to conceal shelter transactions from the IRS by purporting to have the high net worth individual clients engage a law firm to provide legal advice, which law firm would then purport to engage KPMG to work under the direction of the law firm. Although under *United States v. Kovel*, communications by non-lawyer professionals such as accountants are protected under the attorney-client privilege when the accountant is in fact working under the direction of an attorney, numerous *Kovel* arrangements established by this former partner were sham arrangements because the individuals did not directly engage the law firm, in many instances never even spoke to the lawyers whom they had purportedly engaged, and the Stratecon Partner's work was done outside of the purported lawyer-client privilege. The purpose of this improper conduct was to enable the high net worth individual client, with

the assistance of the Stratecon Partner, to conceal the fraudulent tax shelter from the IRS by attempting to cloak all of the work for the shelter in the attorney-client privilege. The Stratecon Partner's conduct was well known to his supervisors who were later promoted to the positions of Vice Chairman in charge of Tax and Chief Financial Officer. This abuse of the attorney-client privilege was used by the Stratecon Partner (with the knowledge and approval of his supervisors) to circumvent the firm's internal controls, and to prevent others at KPMG from having full access to documents relating to the Stratecon Partner's fraudulent activities.

27. Some KPMG tax partners and tax leaders also routinely attempted to cloak in the attorney-client privilege communications that revealed the true nature of their conduct even though those communications were not privileged — i.e., they were not conveying confidential information to attorneys for the purpose of receiving legal advice — by routinely copying an Associate General Counsel on email communications and memoranda in an effort to conceal information contained in those communications and memoranda from the IRS and others.

***KPMG's Responses to IRS and Senate Investigations of its Fraudulent Tax Shelter Activities***

28. Despite the efforts described above by the tax partners to prevent IRS scrutiny of these tax shelters, the IRS became aware of certain of these tax shelters and in September 2001 it initiated an examination of KPMG for its failure to register the transactions with the IRS. As part of this examination, in early 2002 the IRS issued 25 summonses to KPMG calling for the provision of information relating to numerous tax strategies with which KPMG may have been involved. In response to these 25 summonses, KPMG provided the IRS with several hundred boxes of documents responsive to the summonses. However, hundreds of documents were withheld on claims of privilege that were later rejected by a United States District Court based on the Court's determination, which KPMG did not appeal, that KPMG had "misrepresent[ed] its unprivileged tax shelter marketing activities as privileged communications."

29. In addition, the IRS summonses required KPMG to designate a knowledgeable person to testify under oath at the IRS. KPMG's tax leadership designated the partner in charge of the PFP group (the "PFP Leader") to testify. A KPMG representative who attended the first of the PFP Leader's four days of testimony expressed the view to several KPMG tax leaders that the PFP Leader's testimony was, in many respects, misleading and evasive. This testimony was not supplemented or corrected.

30. One of the 25 summonses to which KPMG responded called for production of documents relating to transactions described in an IRS administrative notice designated as Notice 2000-44. KPMG tax partners understood that documents relating to BLIPS and SOS were called for in response to this

summons and others. KPMG produced certain documents relating to BLIPS but did not produce any documents relating to SOS. Despite the involvement of a number of its tax partners in the marketing and sale of SOS transactions, which was well known to several members of KPMG's tax leadership and certain partners responsible for responding to the summonses, no documents relating to SOS were collected as part of the initial summons response process, and on several occasions prior to early 2003, the IRS was falsely advised that KPMG had largely complied with the IRS summonses.

31. In addition, as several members of KPMG's tax leadership and certain partners responsible for responding to the summonses well knew, information and documents relating to the Stratecon Partner's activities were called for by summonses issued by the IRS to KPMG. Indeed, the Stratecon Partner had arranged for at least 14 KPMG partners to engage in SOS transactions for their own account. Nevertheless, KPMG did not produce to the IRS in response to summonses any documents or information relating to the Stratecon Partner's tax shelter activities until 2004, and on several occasions prior to early 2003, the IRS was falsely advised that KPMG had largely complied with the IRS summonses.

32. In early 2003, the IRS became aware that KPMG tax partners had helped some high net worth individual clients participate in SOS tax shelters. In May 2003, IRS agents directly asked KPMG, through its outside counsel, what role KPMG had played in the SOS shelters. A KPMG tax partner seeking information in response to that inquiry conveyed the IRS' inquiry to the PFP Leader, who falsely advised that the only role that KPMG had played with respect to SOS was to assist a couple of high net worth individual clients in preparing and filing tax returns that reflected the tax losses from SOS transactions. This false representation was then relayed to the firm's counsel, and then made to the IRS. In fact, KPMG was in possession of numerous responsive documents and the existence of those documents was known to senior tax leaders and legal compliance personnel directing the summons-response process. Yet, none of the SOS transactions marketed and sold by KPMG tax partners were provided to the IRS until late 2003 and early 2004.

33. In January 2003, the Permanent Subcommittee on Investigations of the United States Senate's Committee on Governmental Affairs (the "Subcommittee") commenced an investigation into efforts of several major accounting firms, including KPMG, to mass market abusive tax shelters. As part of that investigation, the Subcommittee issued a subpoena to KPMG calling for the production of certain documents, including information relating to tax shelters used by certain KPMG partners to avoid their own taxes. KPMG was in possession of numerous documents responsive to that request and several senior tax partners and KPMG's Office of General Counsel were well aware of those tax shelters and documents and the Subcommittee's request for them. In February 2003, KPMG stated that "to

the best of its knowledge and belief, after reasonable inquiry to date, the firm has not yet identified any documents that are responsive to this request," and the firm subsequently negotiated with the Subcommittee as to the scope of the subpoena. None of the documents relating to SOS transactions, including tax shelters used by certain KPMG partners on their own account, was produced to the Senate.

34. In November 2003, several KPMG tax partners testified in a public hearing before the Subcommittee. The PFP Leader delivered KPMG's official statement to the Subcommittee, and then falsely denied in response to one question that KPMG's fee was a percentage of the tax loss to be generated by the shelters. In addition, when asked by a Senator whether FLIP, OPIS and BLIPS were "designed and marketed primarily as tax reduction strategies," the PFP Leader falsely stated "Senator, I would not agree with that characterization." The testimony of KPMG's representatives before the Subcommittee was misleading and evasive in other ways, at one point prompting a Senator to admonish the PFP Leader to "try an honest answer" and at another point prompting a Senator to state to KPMG's Vice Chairman in charge of Tax that "I can't get a straight answer out of you to a very direct question."

***KPMG's Cooperation***

35. At the outset of the criminal investigation, KPMG made the decision to cooperate with the Government. To that end, KPMG, on its own initiative, determined to condition employment and payment of legal fees for its current and former partners on their cooperation in the investigation, and took disciplinary action, including by refusing to pay attorneys' fees and by terminating the employment of those who chose not to cooperate with the criminal investigation. KPMG also declined to enter into any joint defense agreements with any current or former personnel or any other organizations or individuals whose conduct has been the subject of the Government's investigation. KPMG responded to grand jury subpoenas by providing the Government with documents reflecting the improper and illegal conduct of its tax partners and others, and responded to numerous specific requests for information on particular issues. As the Government's investigation progressed, the firm periodically authorized waivers of attorney-client and work product privileges in order to provide the Government with documents containing factual information of material interest to the Government's investigation. The firm also agreed to limited requests made by the Government to refrain from conducting certain internal inquiries that might have interfered with the Government's own investigation.

36. KPMG has also agreed to fully cooperate with the Government's investigation into criminal wrongdoing associated with the development, promotion, and implementation of tax shelters.