**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York 10007*

October 2, 2006

**By Email**

David Spears, Esq.
Michael J. Madigan, Esq.
Robert S. Fink, Esq.
Joseph DiBlasi, Esq.
Ronald E. DePetris, Esq.
Steven M. Bauer, Esq.
David C. Scheper, Esq.
Gerald B. Lefcourt, Esq.
John R. Wing, Esq.

John Kaley, Esq.
Stuart E. Abrams, Esq.
Christine C. Arguedas, Esq.
George D. Niespolo, Esq.
Michael S. Kim, Esq.
James R. DeVita, Esq.
Russell Gioiella, Esq.
Susan R. Necheles, Esq.
Richard M. Strassberg, Esq.

**Re: United States v. Stein et al., S1 05 Cr. 888 (LAK)**

Dear Counsel:

This letter provides you with the Government's notice of certain "other crimes, wrongs, or acts" that we may seek to prove at trial, pursuant to Rule 404(b) of the Federal Rules of Evidence. These acts relate to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, and establishment of trust among co-conspirators. Please note that much of the conduct set forth below constitutes proof of the crimes charged in the Indictment and is thus admissible without regard to Rule 404(b). We do not mean to suggest by giving notice that such evidence is not also independently admissible, as part of the *res gestae* or otherwise.

A. **Raymond J. Ruble**

1. In late 1996 and early 1997, Raymond Ruble participated in a tax evasion scheme of the United Micronesia Development Association ("UMDA"), an entity in Saipan (part of the Commonwealth of the Northern Mariana Islands) that engaged in a tax shelter transaction called "ZENS". The UMDA ZENS transaction, like the several other ZENS transactions that Ruble and his firm promoted and wrote opinion letters for, produced fraudulent losses to the corporations that executed the transactions, based on false statements in the transaction documents, loan documents, and

DEFENDANT'S EXHIBIT
A

Ruble opinion letter. We do not intend to prove up in our case in chief the intricacies of how a ZENS tax shelter transaction would work if truthfully executed; our focus will be on the false representations. The UMDA ZENS transaction also involved co-conspirator Robert Pfaff, who, acting ostensibly as a KPMG partner, not only assisted UMDA in carrying out the ZENS transaction, but received from certain promoters of the ZENS transaction over $290,000 in secret side fees. (In receiving these secret side fees, Pfaff violated the terms of the then-existing KPMG partnership agreement, which obligated him to report and pay over those fees to KPMG.) Pfaff thereafter knowingly omitted those fees — which he received in January 1997 and used to purchase, among other things, interests in mutual funds, a Porsche Boxter automobile, and a second home — from his U.S. Individual Income Tax Returns for the 1997 tax year. For his role in the UMDA ZENS transaction, Ruble — who neither met with nor spoke with the alleged client, UMDA — caused a fee of $250,000 to be paid to his law firm, Brown & Wood. Unbeknownst to Brown & Wood and the IRS, Ruble also received three secret payments from one of the promoters of the ZENS transaction: $25,000 (in 1996); $47,500 (received in 1996, but categorized as compensation to Ruble in 1997); and $50,000 (in 1997). Ruble omitted those payments from his U.S. Individual Income Tax Returns for the tax years 1996 and 1997.

The foregoing acts by Ruble and Pfaff are admissible principally, but not exclusively, to show knowledge, intent, and the relationship of trust between co-conspirators.

2. In August 1999, Ruble received secret side payments totaling $200,000 from co-conspirators Larson and Pfaff, which payments were made by Pfaff and Larson via their respective "investment trusts" and were labeled by them as "investment interest" payments to Ruble. These side payments were structured in the following manner: Larson and Pfaff, through certain entities they controlled, structured a "midco" tax shelter transaction involving a cable company called SD Cable. Larson and Pfaff then had Ruble provide, to each of Larson and Pfaff, a purported "loan" of $50,000, which was paid from the New York bank account of a trust that Ruble controlled on June 11, 1999 to Larson and Pfaff's trusts. When Larson and Pfaff completed the SD Cable tax shelter transaction approximately 6 weeks later, each one repaid Ruble's trust $150,000, thus yielding Ruble a total profit of $200,000. Ruble failed to disclose these secret payments to the Brown & Wood law firm, of which he was a partner.

The foregoing acts by Rubble, Larson and Pfaff are admissible principally, but not exclusively, to show knowledge, intent, and the relationship of trust among co-conspirators.

In addition to our general comments above regarding admissibility of certain acts discussed herein without regard to Rule 404(b), we especially do not consider these August 1999 payments from Larson and Pfaff to Ruble as "other crimes" proof because the Indictment alleges secret side payments to Ruble in the same time frame. As stated generally above, we include the allegations here in the event the Court does not agree that these payments are covered by the allegations in the Indictment or otherwise admissible on a non-404(b) basis (such as *res gestae*).

**B. <u>David Greenberg</u>**

1. David Greenberg was a partner of KPMG from 1999 through 2003. Pursuant to the KPMG partnership agreement, Greenberg was required to report and pay over to KPMG all income earned from professional services, and was prohibited from competing against KPMG with respect to providing professional services. While a partner at KPMG, Greenberg was involved principally with selling and implementing various SOS tax shelter transactions, as well as a tiered partnership tax shelter. In violation of the KPMG partnership agreement and while a KPMG partner, Greenberg was engaged in a fee splitting agreement with William Goddard, an attorney. Greenberg, in the name of entities known as GG Capital and FP IV, split equally with Goddard over $40 million of fees stemming from the sale and implementation of the SOS transactions and tiered partnership tax shelters. Greenberg misrepresented to KPMG the amount of fees he charged for selling and implementing the aforementioned tax shelters and concealed his involvement in the fee-splitting arrangement with Goddard.

   Greenberg failed to report over $20 million of income from his fee splitting arrangement with Goddard on his individual income tax returns, forms 1040, for years 1999 through 2003. Greenberg also falsely and fraudulently claimed that approximately $800,000 of income he earned in 1999 and 2000 as a partner in the then Big Six Accounting firm Deloitte and Touche was not his income but funds he received as a nominee, thereby failing to pay income tax on over $800,000 of income. Additionally for years 2000 and 2001 Greenberg falsely and fraudulently deducted non-passive losses of at least $737,803 and $819,824 respectively. Greenberg falsely and fraudulently claimed that these "losses" were his distributive share of KPMG non-passive losses. By doing so, Greenberg failed to pay

income tax on an additional $1,557,627.

The foregoing acts by Greenberg are admissible principally, but not exclusively, to show motive, knowledge, and intent.

2. During the tax years 1999-2003, David Greenberg promoted and implemented a tax shelter transaction known as "tiered partnership," or "triple by-pass," which was styled as a mechanism to defer taxes but which Greenberg fraudulently peddled and implemented as a mechanism to permanently eliminate the tax obligations of participants. Among the persons to whom Greenberg sold a "triple bypass" tax shelter was co-defendant Gregg Ritchie's boss at Pacific Capital Group. As noted below, Greenberg and Ritchie endeavored to implement the triple bypass shelter for Ritchie's boss in a fraudulent manner — that is, to permanently evade or eliminate taxes.

The foregoing acts by Greenberg and Ritchie are admissible principally, but not exclusively, to show knowledge, intent, and the relationship of trust between co-conspirators.

C. **Robert Pfaff**

1. Between 1993 and 2003, Robert Pfaff participated in a scheme with several other tax shelter promoters and others to implement tax shelters and generate fees that he would split with the other tax shelter promoters and others. Pursuant to this agreement, Pfaff received in excess of $2,500,000 in fees, which he failed timely to report to the IRS. In excess of $500,000 of those fees were received between 1993 and July 1997 (while Pfaff served as a partner at KPMG), yet Pfaff failed to report and pay over those fees to KPMG, pursuant to the then-existing partnership agreement to which he was a party.

The foregoing acts by Pfaff are admissible principally, but not exclusively, to show knowledge and intent.

2. In or about 1998, Pfaff and others orchestrated and participated in a fraudulent tax shelter transaction known as "Somer Leasing." The tax shelter transaction was fraudulent because it, among other things, employed a non-resident alien individual that Pfaff and others inserted into the transaction as a nominee, or puppet, in order to make use of the foreign person's status as a tax-indifferent person. In connection with this

transaction, Pfaff transferred certain payments that he was entitled to receive through Presidio in order that two co-conspirators (including a New York-based banker who helped provide financing for the deal and who later assisted in enlisting his bank to participate in BLIPS) would be able to receive a portion of the fee that Pfaff was to receive.

The foregoing acts by Pfaff are admissible principally, but not exclusively, to show knowledge and intent.

3. Between 1993 and 1998, Pfaff, John Larson, and others participated in a series of fraudulent tax shelter transactions where he caused entities he secretly controlled — including one named "Skandia" — to be inserted into tax shelter transactions based on the non-resident alien status of the purported owners. (The purported owner of Skandia, for instance, was a Norwegian citizen whom Pfaff had known for decades.) In truth and in fact, Pfaff was a secret owner of many of the entities (including Skandia) who: structured the deals in which Skandia and the other entities were involved; controlled the activities of the purported owners of the entities, including Skandia; shared, with Larson and others, in the profits derived from the involvement of Skandia and the other entities in tax shelter activities, including those while Pfaff was a partner at KPMG and Larson a senior manager; and conspired to make secret payments to a New York banker whose bank was enlisted to participate in the Skandia-related transactions.

The foregoing acts by Pfaff and Larson are admissible principally, but not exclusively, to show knowledge, intent and the relationship of trust between co-conspirators.

4. See Ruble ## 1 & 2, above.

**D. John Larson**

1. See Ruble #2, above.

2. See Robert Pfaff #3, above.

**E. Carl Hasting**

1. In or about 2001, in connection with his promotion while at KPMG of fraudulent "distressed debt" tax shelters together with a promoter known as Gramercy, Hasting was paid a secret $75,000 commission by Gramercy in consideration for Hasting recommending or counseling KPMG clients to engage in Gramercy "distressed debt" tax shelter transactions. The secret payment was made to Hasting when one of the principals of Gramercy caused the crediting of Hasting's own account with Gramercy, an entity through which Hasting executed two personal "distressed debt" tax shelter transactions in 2001 and 2002. Although Hasting was issued a K-1 by Gramercy that reflected the $75,000 side payment, Hasting failed to accurately report his receipt of the secret side income on his U.S. Individual Income Tax Return. Hasting also hid his receipt of the side fee from his employer, KPMG.

The foregoing acts by Hasting are admissible principally, but not exclusively, to show knowledge and intent.

**F. Gregg Ritchie**

1. During the tax years 1999-2003, David Greenberg promoted and implemented a tax shelter transaction known as "tiered partnership," or "triple by-pass," which was styled as a mechanism to defer taxes but which Greenberg fraudulently peddled and helped implement as a mechanism to permanently evade the tax obligations of participants, rather than defer those obligations. Among the persons to whom Greenberg sold a "triple bypass" tax shelter was co-defendant Gregg Ritchie's boss at Pacific Capital Group. Ritchie assisted his boss in entering into the Greenberg triple bypass transaction, and thereafter endeavored to implement that transaction in a fraudulent manner — that is, to permanently evade his boss's taxes.

The foregoing acts by Greenberg and Ritchie are admissible principally, but not exclusively, to show knowledge, intent, and the relationship of trust between co-conspirators.

**G. Carol Warley**

1. In or about July 10, 2003, Carol Warley signed a "more-likely-than-not" opinion letter for KPMG with respect to a tax shelter transaction entered into by a Texas-based KPMG client in 2002. Carol Warley signed that

opinion letter even though KPMG's Washington National Tax group, as well as the manager working directly for Carol Warley on the issue, had concluded that they could not reach a "more-likely-than-not" opinion on the transaction. In addition, outside law firms consulted on the strategy could not get to "more-likely-than-not." In order to create a "more-likely-than-not" opinion for the client and thus allow the client to proceed with the tax shelter, Carol Warley provided her manager with opinion letters from individuals outside KPMG and directed the manager to write the KPMG opinion by borrowing the language from the outside opinions. When a reviewer within KPMG vetted the opinion, the reviewer disagreed, in Warley's presence, with the part of the analysis that tracked those outside opinions. Upon hearing the disagreement with the conclusion Warley wanted to reach in the opinion, Warley in effect suggested that the reviewer not voice the disagreement in her presence. Warley ultimately signed the opinion letter and issued it to the client, thereby causing the client not to pay tax on millions of dollars that was otherwise taxable. In order to evade an internal KPMG requirement that Washington National Tax vet all opinion letters yielding fees in excess of $1,000,000, Carol Warley set the fee for this transaction at $995,000. Moreover, in order to evade an internal KPMG requirement that opinions generally be posted to an internal opinion database through Washington National Tax, Warley instructed her manager to take the position that the Warley-signed opinion issued to the KPMG client was an attorney/client communication, thus excepting it from the database posting requirement. Warley thus succeeded in preventing any Washington National Tax review of this particular opinion. Jeffery Eischeid was also involved in this transaction, in that he told Warley that she could proceed with the signing and issuance of the opinion notwithstanding the lack of approval of Washington National Tax.

The foregoing acts by Warley and Eischeid are admissible principally, but not exclusively, to show knowledge, intent, and the relationship of trust between co-conspirators.

**H. Jeffrey Eischeid**

1. See Warley #1, above.

Very truly yours,

MICHAEL J. GARCIA
United States Attorney

By: /s/ John M. Hillebrecht
John M. Hillebrecht
Justin S. Weddle
Kevin M. Downing
Stanley J. Okula, Jr.
Rita M. Glavin
Margaret Garnett
Assistant United States Attorneys
(212) 637-2200